## BISHOP MFG. CO. v. SEALY OIL MILL & MFG. CO.   (No. 6302.)

(Court of Civil Appeals of Texas. San Antonio. Jan. 21, 1920. On Motion for Rehearing, March 24, 1920.)

1. **Evidence** ☞313—**Letters held not to establish truth of facts stated therein.**

Letters written by plaintiff to defendant and introduced in evidence by plaintiff did not establish the truth of the statements of fact therein made, but only the fact that they were written and that such statements were made.

2. **Corporations** ☞426(1) — **Ultra vires contract not validated because substituted for similar contract and extending time of performance.**

An ultra vires and unauthorized contract made by an agent of a corporation is not rendered valid by reason of the fact that it is a substitute for a similar contract and merely extends the time of performance.

3. **Corporations** ☞447—**Whether contract is ultra vires must be determined from charter powers.**

Whether a contract is ultra vires must be tested by the charter powers of the corporation.

4. **Corporations** ☞389—**Evidence sufficient to show statute under which corporation must have been incorporated.**

Evidence that a corporation was incorporated under the laws of Texas and operated two cotton gins and an ice plant under the same charter and authorized its secretary and manager to operate mills without specifying the kind of mills was sufficient to show that it was incorporated under Rev. St. 1911, art. 1121, subd. 72.

### On Motion for Rehearing.

5. **Corporations** ☞389—**Evidence insufficient to show that purchase of cotton seed from other than customers was essential to operation of cotton gin.**

In an action against a corporation operating cotton gins for breach of a contract of sale of cotton seed, evidence *held* insufficient to show that the purchase of cotton seed in the open market from persons other than custom-

ers of the gin was essential to the successful operation of the gin.

**6. Corporations ☞458, 487(1)—Ginning corporation may sell cotton seed purchased from customers or actually acquired by ultra vires contracts.**

A corporation incorporated under Rev. St. 1911, art. 1121, subd. 72, and operating cotton gins had power to contract for the sale of cotton seed acquired from its customers and to contract for the sale of seed acquired by means of ultra vires contracts for the purpose of preventing a loss.

**7. Corporations ☞458—Ginning corporation without authority to contract for sale of cotton seed not then on hand.**

A corporation organized under Rev. St. 1911, art. 1121, subd. 72, and operating cotton gins, had no authority to contract for the sale of cotton seed, where it did not then own the seed, and the sale was not based upon any estimate of the amount of seed which could reasonably be expected to be acquired from customers of the gin.

**8. Corporations ☞519(3)—Evidence held to show that speculative sale of cotton seed by ginning company was not to foster ginning business.**

Evidence *held* to show that the purchase and sale of cotton seed in the open market by the secretary and manager of a corporation operating cotton gins was a speculative venture, indulged in for the purpose of making the profit thereon, and was not designed or intended to foster the ginning business.

**9. Corporations ☞458—Trading in cotton seed not essential to milling business authorized but not carried on.**

Though a corporation organized under Rev. St. 1911, art. 1121, subd. 72, and operating cotton gins, was authorized to maintain mills, a contract for the sale of cotton seed not then owned by it could not be upheld as essential to the transaction of a milling business, where it was not carrying on a milling business.

**10. Corporations ☞382—Company carrying on cotton seed oil business not authorized to conduct general trading business in cotton seed.**

A corporation organized under Rev. St. 1911, art. 1121, subd. 72, though conducting a cotton seed oil business, would not be authorized to conduct a general trading business in cotton seed.

Error from District Court, Nueces County; W. B. Hopkins, Judge.

Action by the Sealy Oil Mill & Manufacturing Company against the Bishop Manufacturing Company. Judgment for plaintiff, and defendant brings error. Reversed and rendered.

B. D. Tarlton, Jr., of Beeville, and G. R. Scott, Boone & Pope, of Corpus Christi, for plaintiff in error.

C. G. Krueger, of Bellville, for defendant in error.

MOURSUND, J. The Sealy Oil Mill & Manufacturing Company sued the Bishop Manufacturing Company for damages for breach of a contract to sell cotton seed to plaintiff. The defendant company, in addition to a general denial, relied upon pleas that its secretary and general manager had no power or authority to make such a contract as was sued on; that such contract, if made, was wholly beyond the express and implied powers of defendant; and that the contract was wholly without consideration.

By supplemental petition it was alleged that the purchase of cotton seed was essential and a necessary incident to the successful operation of the defendant's plant, and so closely connected therewith that the authority to make contracts for the sale of such seed is a necessary incident to its successful operation of its gin, and that therefore it had full authority to make the contract sued on; that Nuckols in making the contract was then and there acting within the apparent scope of his authority; that defendant had ratified said contract and acquiesced in the same for nearly two years; and that it was now estopped from denying the same or pleading the plea of ultra vires. This petition was excepted to on various grounds, and the allegations thereof denied.

Judgment was rendered for plaintiff for $3,050, with interest, and findings of fact and conclusions of law filed as follows:

"(1) I find as a fact that both the plaintiff and defendant are corporations incorporated under the general laws of the state of Texas.

"(2) I find as a fact that on the 7th day of April, A. D. 1916, the defendant made and entered into a 'contract with the plaintiff by which it sold to plaintiff, and agreed, bound, and obligated itself to deliver unto the plaintiff in railroad cars upon the railroad tracks at Bishop, Tex., in the months of August and September, A. D. 1916, five cars of good, sound, clean, prime cotton seed, for and in consideration of $32.50 per ton, two cars to be delivered by defendant to plaintiff in the month of August, 1916, and three cars to be delivered in the month of September, 1916. I find that plaintiff agreed, bound, and obligated itself to take, receive, and pay for said five cars of cotton seed at the rate of $32.50 per ton in the months of August and September, 1916, when delivered by defendant in railroad cars upon the railroad tracks at Bishop, Tex.

"(3) I find as a fact that the defendant failed to deliver said cotton seed either in the month of August, 1916, or September, 1916, as provided for in said contract, although often requested by plaintiff so to do, but wholly breached its said contract.

"(4) I further find as a fact that, after the defendant had failed to comply with its said contract, it asked for an extension of the time in the performance of its said contract until August and September, 1917. I find that in the latter part of October, A. D. 1916, the plaintiff agreed with the defendant to extend

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the time for the delivery of said five cars of cotton seed until August and September, 1917, and that thereupon the plaintiff and defendant changed the original contract and substituted therefor another contract in every respect the same as the original contract, except that the five cars of cotton seed should be delivered in the months of August and September, A. D. 1917; that is, two cars of cotton seed should be delivered by the defendant to the plaintiff in railroad cars upon the railroad tracks at Bishop, Tex., or its nearest shipping point, in the month of August, 1917, and the remaining three cars should be delivered by defendant to the plaintiff in railroad cars upon the railroad tracks at Bishop, Tex., or its nearest shipping point, in the month of September, 1917. I find that plaintiff agreed, bound, and obligated itself to take, receive, and pay for said five cars of cotton seed at the rate of $32.50 per ton in the months of August and September, 1917, when delivered by defendant in railroad cars upon the railroad tracks at Bishop, Tex., which was its nearest shipping point.

"(5) I find as a fact that the defendant failed and refused to deliver the two cars of cotton seed in the month of August, 1917, and also failed and refused to deliver the three cars of cotton seed in the month of September, 1917, as provided in said contract and as it had agreed to do, but breached its said contract.

"(6) I find as a fact that at the time the original contract and at the time the substitute contract was made and executed that W. E. Schier was the general manager for the plaintiff, Sealy Oil Mill & Manufacturing Company, and M. Nuckols was the secretary and general manager for the defendant, Bishop Manufacturing Company.

"(7) I find as a fact that the board of directors of the defendant Bishop Manufacturing Company held M. Nuckols out to the world as its secretary and general manager, and that he acted in that capacity, and in truth and in fact was its secretary and general manager.

"(8) I find that the Bishop Manufacturing Company, defendant, owned and operated a cotton gin at Bishop, Tex.; that it was incorporated, among other things, for that purpose. I find that it ginned cotton for cotton farmers, and took cotton seed in exchange for its services rendered to the farmer and paid to the farmer the difference between the value of the cotton seed and the amount charged for its services. I also find that it had been engaged in buying cotton seed from farmers ever since its incorporation in 1913 up to the present time.

"(9) I find as a fact that it is and has for many years been customary and is the universal practice of all persons and corporations owning and operating cotton gins in this state, to engage in the purchase of cotton seed and sell the same to oil mills and other parties, and I find that it is essential for the purpose of their incorporation business for cotton gin owners to do so.

"(10) I find as a fact that the defendant pursued the customary practice, and engaged in the purchase of cotton seed and the sale of it, and that it was essential for it to do so for the successful operation of its cotton gin.

"(11) I find as a fact that after the defendant had entered into the contract with plaintiff to deliver unto the plaintiff the five cars of cotton seed in the months of August and September, A. D. 1917, the plaintiff sold oil and cotton seed cake against it for future delivery based upon the contract price of cotton seed expressed in said contract.

"(12) I find that the defendant has adopted by-laws for the government of its officers in the management of its business, but that the plaintiff had no knowledge of such by-laws or the contents thereof or any provision in same.

"(13) I find as a fact that by the words 'five cars of good, clean, sound, prime cotton seed,' as expressed in the contract, is meant five average railroad cars loaded to their average capacity.

"(14) I find that an average railroad car loaded to its average capacity contains 20 tons of cotton seed.

"(15) I find that in the month of August, 1917, the market price of cotton seed at Bishop, Tex., was $60 per ton, and in the month of September, 1917, the market price of cotton seed at Bishop, Tex., was $65 per ton.

"(16) I find as a fact that the difference between the contract price and the market price of the five cars of cotton seed at the time same should have been delivered is $3,050. I find that the plaintiff, the Sealy Oil Mill & Manufacturing Company, has sustained damages in the sum of $3,050 by reason of the defendant's breach of its said contract in failing to deliver said five cars of cotton seed at the time and place specified in said contract.

"(17) I find that the substituted contract mentioned in the fourth finding above was not only upon the good and valuable consideration expressed upon its face, but was also in consideration of such substitution and of releasing defendant from the performance of the original contract at the time therein stated, and that such substituted contract was beneficial to and for a purpose of the defendant company.

"(18) The periods and times pertaining to the seventh through the tenth findings of fact are during 1916 and 1917, and for a number of years prior thereto.

"Conclusions of Law.

"(1) I conclude as a matter of law that the plaintiff is entitled to recover of and from the defendant, Bishop Manufacturing Company, the difference between the contract price of cotton seed per ton and the actual market price of cotton seed per ton at the time said five cars of cotton seed should have been delivered to plaintiff under said contract, which amount I found to be $3,050.

"(2) I conclude as a matter of law that M. Nuckols, as secretary and general manager for the defendant, Bishop Manufacturing Company, has authority to make and enter into the contract sued upon and bind the defendant.

"(3) I also conclude as a matter of law that the defendant is estopped to deny that M. Nuckols, its secretary and general manager, was not authorized and empowered to make and enter into the contract sued upon.

"(4) I further conclude as a matter of law that the purchase and sale of cotton seed by the defendant was essential to the transaction of its authorized business and for the success of its business.

"(5) I further conclude as a matter of law

that article 1121, § 72, of the Revised Civil Statutes of Texas, under which defendant was incorporated, does not define its powers definitely nor limit and restrict its powers and authority to any certain definite and specific purpose, and that therefore a corporation incorporated under said article and section of the statutes has authority to do and transact such business and matters as are essential to the transaction of its authorized business, or as is customarily and usually done by institutions of like character in furtherance of their business.

"(6) I conclude as a matter of law that the defendant should not be permitted to plead ultra vires because plaintiff has been damaged and great injustice would be done plaintiff if defendant was permitted so to do, as plaintiff had sold oil and cake against the seed it had purchased based upon the contract price of seed at $32.50 per ton, and had to purchase either seed at a higher price in order to fill its said contracts."

The second, third, fourth, and eleventh findings of fact and the first, second, third, and sixth conclusions of law are directly challenged by appellant, and by the first assignment it is contended that the judgment of the court is contrary to the undisputed evidence. In this connection the contentions of plaintiff in error concerning what is shown by the evidence are stated as follows:

" * * * That Bishop Manufacturing Company was incorporated at the time the alleged contracts were made and breached, and that it had certain well-defined and fixed charter powers and purposes, none of which included either expressly or impliedly the purchase and sale of cotton seed on the open market or the purchase and sale of cotton seed on the open market for future delivery; that the alleged contracts were ultra vires and void; that there was no ratification thereof by those having power to so bind the corporation; that the alleged contracts were made by M. Nuckols, secretary and general manager of the corporation, who was without power or authority, either expressly or by implication, to bind the Bishop Manufacturing Company thereby or to lay the Bishop Manufacturing Company liable to damages for an alleged breach thereof, and there is no evidence in the record of any ratification of said contracts or estoppel on the part of said corporation to deny the unauthorized acts of its said agent, and there is no evidence in the record to warrant a finding that the business of buying and selling cotton seed on the market generally, and the business of buying and selling cotton seed for future delivery was either necessarily incidental to the purposes and business of said corporation or essential to the operation, conduct, and prosecution of the business of said corporation."

The propositions of law relied on are: First, that the contract was ultra vires, and that appellant received no benefits therefrom and was not estopped to rely on the plea of ultra vires; and, second, that Nuckols had no authority, real, apparent, or implied, to make such a contract, and that appellant did not ratify his act and received no benefits

thereunder, and therefore could not be held liable for a breach thereof.

The findings of fact which are challenged are subject to the following objections:

(1) The legal conclusion that defendant entered into the two contracts mentioned should be discarded, and in lieu thereof the fact substituted that such contracts were made by Nuckols, purporting to act for defendant, and that all negotiations of any kind which took place with reference to said contracts were conducted by Nuckols, and not participated in or ratified by the directors of defendant company.

[1] (2) The finding that plaintiff sold oil and cotton seed cake against the contract for future delivery based upon the contract price of cotton seed expressed in said contract is not warranted by the evidence. In support of the findings three letters are referred to written by plaintiff to defendant. The introduction in evidence of these letters established the fact that they were written and that certain statements were made therein, but certainly could not establish that all statements of fact therein made were true. If the truth of the statements had been shown, such statements would not have justified the broad finding of the court; for there was nothing in the statements indicating that a lower price had been placed on the products claimed to have been sold than would be justified by the market price of cotton seed at the time of such contracts. The inference from the letters is that the plaintiff in contracting figured it would get the five cars of cotton seed, but it should be indeed mere surmise to say that the idea was conveyed that the price had anything to do with the selling price of the products referred to as having been sold by plaintiff. There was no evidence that cotton seed could not be bought in the open market to fill any contracts that might have been made; so it is evident that so far as this record discloses, the only element of loss incurred by defendant in error by reason of the making of such contract and the repudiation thereof, is the profit which would have been realized by virtue of the fact that the value of cotton seed had advanced.

[2] (3) The new contract was a substitute for the first contract, and naturally operated to cancel the first contract. The plaintiff bound itself to pay for the cotton seed when delivered, and, as it was never delivered, plaintiff never delivered anything of value to defendant on the faith of the contract. There is no evidence that the contract was beneficial to and for a purpose of the defendant company. The finding seems to have been based on the theory that the substitution of a contract extending the time conferred a benefit upon defendant. If this was the only benefit, it might as well have been omitted from the findings, as an ultra vires

or unauthorized contract made by an agent would not be rendered valid by reason of the fact that it was a substitute for a similar contract and merely extended the time of performance.

(4) The conclusion that the contract was for a purpose of defendant and the finding that it is essential for the purpose of their incorporation business for cotton gin owners generally and for plaintiff in error to engage in the purchase and sale of cotton seed in the open market are not ,warranted by the evidence.

The statement of the witness Baldwin concerning the purchase of cotton seed being essential to the cotton ginning business was based by him upon the fact that many people are not prepared to take care of their seed, and unless the gin buys them it will not do business; in other words, a custom has arisen for gins to buy seed from their customers because the latter are not prepared to handle the seed. He did not undertake to show how the purchase of seed from others than customers would in any manner affect the extent of the ginning business.

In view of the findings made by us, it is apparent that no element of estoppel or ratification enters into this case, and the only questions of law are: First, whether the contract was ultra vires; and, second, if it was not, did Nuckols have authority to make the same?

[3, 4] In order to determine whether a contract is ultra vires, it must be tested by the charter powers of the corporation. Defendant in error contends that this cannot be done because the charter is not in evidence, and the amendment thereto, which was introduced in evidence, merely changed the name, and did not enumerate the purposes for which the incorporation was secured. The plaintiff in error stated in its pleading the purposes for which it was incorporated, and the court in his fifth conclusion of law stated that it was incorporated under section 72 of article 1121 of the Revised Civil Statutes. The evidence on the point is as follows: Incorporation was had under the laws of Texas. The corporation operated two gins and an ice plant. Nuckols testified that the gin out in the country was operated under the same charter. He also testified:

"My company authorized me to operate mills, but did not specify the kind of mills."

We believe the evidence is sufficient to show that the charter was secured under the provisions of section 72 of article 1121, R. S. 1911. Under the law its purposes were bound to have been limited to those specified in said section. The court found that defendant was incorporated under said provision, which finding was necessarily one of fact, although stated in connection with a conclusion of law, and the correctness thereof has not been challenged by appellee by any cross assignment of error.

The statute above referred to under which plaintiff in error was incorporated reads as follows:

"Private corporations may be created for, or after being created, may be amended so as to include two or more of the following purposes, namely: The construction or purchase and maintenance of mills and gins; the manufacture and supply to the public, by any means, of ice, gas, light, heat, water and electric motor power, or either, in connection with such mills or gins, or either, the harvesting of grain, or the harvesting and threshing of grain; provided, that the authorized capital stock of all incorporations, authorized by this subdivision shall not exceed two hundred and fifty thousand dollars."

It appears that ,when cotton was ginned by plaintiff in error company Nuckols purchased, the seed if the owner wished to sell, and ,the difference in the price of ginning and that of· the seed was paid; also that he purchased· seed from persons who did not have any· ginning done; in other words, went into the open market and bought cotton seed; also· that in 1918 he even bought and sold cotton. The transaction with defendant in error was the only one in which he undertook to sell cotton seed which plaintiff in error did not have on hand, and long before it could be determined with any degree of certainty what the market price would be. He testified that this was the first and only time he ever sold seed before the crop came in, but that he had sold seed for five or ten days shipment.

This suit does not involve a contract by plaintiff in error to purchase cotton seed, and ,we do not think it is necessary to deal at length with the question concerning its powers in that respect. It may be conceded that, if it acquires cotton seed, even though by an ultra vires contract, it could make a legal sale thereof. If it be necessary that it should buy cotton seed from its customers, or even from others, it does not follow that it is necessary or proper that it should contract for the sale of cotton seed which it does not possess. There can be no necessity for entering into a contract for the sale of something it does not possess. A contract for the delivery of cotton seed six months in the future, made upon the expectation of purchasing such seed in time to fulfill the contract, is nothing more than speculating in the cotton seed market. Such a contract cannot tend in any way to further the purposes of the ·corporation in so far as conducting the ginning business is concerned. It is simply speculating in the cotton seed market, and it cannot be contended that any stockholder of a gin corporation would understand that the officers thereof were authorized to engage in such a business.

We conclude that the contract was clearly ultra vires: North Side Ry. Co. v. Worthington, 88 Tex. 562, 30 S. W. 1055; Planters'

Cotton Oil Co. v. Guarantee State Bank of Mertens, 188 S. W. 39.

There being no element of estoppel in the case, the judgment is not supported by the evidence.

While our holding on the issue above discussed disposes of the case, and the issue raised concerning Nuckols' authority need not be discussed, we deem it proper to say that the record wholly fails to show authority, actual or apparent, on the part of Nuckols to make the contract in question.

The judgment is reversed, and judgment rendered that defendant in error take nothing by its suit.

### On Motion for Rehearing.

The plaintiff in its supplemental petition alleged that defendant was engaged in operating a cotton gin, and while thus engaged frequently received cotton seed in lieu of money for ginning cotton, and that in so doing it must naturally dispose of such seed, and "such disposition of cotton seed so taken by defendant in exchange for the labor of ginning cotton for farmers is essential and a necessary incident to the operation of its plant," and that therefore it had full authority to make the contract as alleged in plaintiff's petition. It was not alleged, however, that the defendant at the time of making such contract, or the one for which it was substituted, had on hand any cotton seed. Nor was it alleged that plaintiff was led to believe that it did have such seed on hand, or that it expected to deliver seed to be acquired for ginning in lieu of money, if these facts could be material upon the inquiry whether the contract was ultra vires. So far as estoppel is concerned, plaintiff only pleaded the conclusion that defendant was estopped, without stating any fact relied on as ground for estoppel. The general manager of plaintiff corporation, who made the contract with Nuckols, testified that he knew that plaintiff was a corporation, and testified to no facts that would tend to show any element of estoppel.

The defendant corporation was operating two gins and an ice factory under its charter. It was permitted under its charter to maintain and operate mills, but there was no pleading or evidence that it owned or operated any mill, and, if it had owned a cotton seed oil mill, it would have purchased cotton seed for use, and not for resale, and would not have been justified in assuming long in advance of the cotton season that it would purchase five cars of seed more than it could utilize in its business. The business which it actually conducted was that of ginning cotton for fees and manufacturing and selling ice. As a matter of fact, it also undertook to conduct a general trading business in cotton, cotton seed, and grain. Of course, if the fact that it ginned cotton authorized it to engage in the purchase and sale of cotton and cotton seed, it could under its charter engage in the business of harvesting and threshing grain, and that ought then by the same process of reasoning to authorize it to engage in the business of buying and selling grain; in other words, a charter under subdivision 72 of article 1121 would include the business of the purchase and sale of agricultural and farm products, provided for under subdivision 24, as to cotton and cotton seed and all kinds of grain.

The Legislature, in providing separately for an incorporation for the maintenance of a gin, must have intended that the real purpose of the incorporation should be that of making a profit out of the fees received for ginning, and not out of trading in farm products. It found it necessary to expressly authorize a corporation chartered for the manufacture of ice to go into the business of buying, selling, and refrigerating poultry, etc. Bearing in mind that the purpose of the corporation, in so far as its ginning business is concerned, is to make a profit from the fees charged for ginning cotton, it seems that it was never intended for such a corporation to engage in the business of buying and selling cotton and cotton seed for a profit. It will not do to say that a corporation will be at a disadvantage when competing with an individual unless it is permitted to engage in trading enterprises, for that disadvantage is inevitable. It is one of the limitations imposed in consideration of limited liability. The individual engaged in the ginning business can engage in any other business if he wants to do so. He can surround his gin with other business enterprises with the view of drawing trade to that vicinity, and thus indirectly benefiting his ginning business. The corporation cannot do this; otherwise it would be folly to prescribe purposes in a charter, or enact statutes containing subdivisions classifying corporations with respect to the powers permitted to be exercised.

[5] The evidence shows, however, that it is the custom of many gins to purchase and sell cotton seed; that this custom had its origin in the fact that the farmers who had ginning done wished to pay in cotton seed, and sometimes did not want to be troubled with the handling of the seed. So far as the purchase of cotton seed from customers is concerned, when necessary to retain their business, there can be no doubt that such purchase constitutes a direct method of accomplishing the purpose of the corporation to make a profit out of the ginning fees. To go out into the open market and buy seed from noncustomers, if it has any effect at all on the ginning business, affects the same as indirectly as that of the purchase of farm products other than cotton seed. The question whether it is necessary in order to foster the business of ginning to purchase seed from the

customers is, of course, dependent on the facts. If there is such a market for seed that the farmer can sell without removing the seed from the gin or going to any trouble whatever, it is difficult to see how it could make any difference in the volume of the ginning business whether the gin company purchases the seed or some other person purchases the same. The evidence of Nuckols, which is uncontradicted, is that during 1916 and 1917 it was not necessary for the farmers to get the gin to take their seed in order to find a market for them, and that it was not necessary for defendant corporation to take cotton seed for ginning in order to enable it to gin cotton. He also testified that he did not think it was essential to the operation of the corporation that it buy seed from the farmer who came there with cotton to be ginned; that their purpose in buying the seed and reselling it was to make the profit incident thereto. He explained the situation with respect to buyers and the market at Bishop, and plaintiff's witness Baldwin, whose testimony was relied on to show the custom and necessity of buying from customers, stated that in a town on the railroad, in which there were buyers, he would not think it necessary for the ginner to buy seed. He also testified that in 1916 and 1917 a man did not have to hunt a buyer for cotton seed; that the demand was greater than the supply.

The evidence disclosed further that the amount of cotton seed offered for sale by customers to the ginner is very uncertain, being dependent on the size of the crop. A certain amount of seed is always retained for planting or feeding purposes. The crops in 1916 and 1917 were very short in the vicinity of Bishop, and only a limited amount of seed was marketed.

[6] The court disregarded the uncontradicted testimony of Nuckols, and found not only that it was essential for the defendant gin to buy and sell seed for the successful operation of its gin, but that it was essential for all corporations and persons in the state to do so. These findings follow a finding that defendant ginned cotton for farmers and took cotton seed in exchange for its services, but the court failed to state whether only the purchase from its customers was essential, or whether the general business of buying and selling cotton seed in the open market was essential. The evidence wholly fails to show that it was essential to go into the open market and engage in the business of buying and selling cotton seed. We think the court would have been justified in finding that the act of purchasing seed from customers who requested defendant to buy was an act within the power of the corporation in view of the custom and the direct effect which a failure to purchase might have upon the ginning business. The evidence does not show what amount of cotton seed had been acquired during any ginning season from customers. Of course, the corporation would have the power to make a contract for the sale of seed thus acquired. It would also have the power to make a contract for the sale of seed acquired by means of ultra vires contracts; for the power to make such sale would arise from the necessity of preventing a loss.

[7] The contract in this case, however, was not one for the sale of seed owned by the corporation, nor was it based upon any estimate, so far as the record discloses, of the amount of seed which could reasonably be expected would be acquired from customers. It was a contract to sell from 100 to 125 tons of seed which it did not own at the time, and which it might or might not secure in the exercise of its implied power to take seed from customers in order to obtain or retain their ginning business. There is not a particle of evidence that such contracts are necessary or usual in the ginning business. The evidence affirmatively shows that there was no necessity for any such contract; for it shows that there was always a market for the seed, and that the defendant could at all times at once resell such seed as it acquired from customers, and, if it bought at the market price, such resale could be made without loss, thus retaining the good will of its customers and avoiding speculation. There being no necessity for making the contract of sale, and it being clearly one which could not have any bearing upon obtaining customers for the gin, either directly or indirectly, it appeared to us and still appears to us that the contract simply involved a trading speculation.

[8] In addition we will say that, if such a contract could be held to constitute a direct means of fostering the charter business, the evidence discloses that it is an unusual means, and not designed or intended for the fostering of the ginning business, but as a speculative venture indulged in by Nuckols in the hope of making a profit in the independent business of trading in agricultural products.

We do not consider this case as analogous to the ordinary cases in which corporations make contracts for the sale of their products before they have manufactured the same. An illustration of such cases is furnished by Taylor Cotton Oil Co. v. Early-Foster Co., 204 S. W. 1179, in which it was held that a corporation chartered to do a cotton oil business could make an advance contract for the sale of 850 to 950 bales of linters, its estimated output during the year 1915–16. It had the right to sell its oil and linters, such right being embraced in its charter purpose, and, in accordance with the usual custom of the oil mill business, could make a contract in advance for the sale of its estimated output. It is a selling corporation by virtue of its charter powers with reference to the products resulting from the operation of its man-

220 S.W.—14

ufacturing business, and a contract for the sale of such products has a direct relation to the business authorized by charter. It seems to us that it is much easier to sustain such contracts than a contract which involves entry into the selling business as to products not produced by it, and in which it has no authority to trade other than that implied from the necessity of disposing of property obtained in fostering the charter business. While we realize the difficulty, in cases of this kind, of determining whether a power to make a certain contract can be implied, we conclude that, when the contract involved in this case is tested by the rules approved in the case of Northside Ry. v. Worthington, 88 Tex. 562, 30 S. W. 1055, 53 Am. St. Rep. 778, and those enunciated in the case of Hdw. Mfg. Co. v. Perry Stove Co., 86 Tex. 143, 24 S. W. 16, 22 L. R. A. 802, it must be held to be an ultra vires contract.

[9, 10] Defendant in error admits in argument that "it will be observed from the pleadings of the plaintiff in error and from the testimony given by H. Nuckols, its secretary and general manager, that the plaintiff in error was incorporated for the purpose of operating mills, gins, and the manufacture of ice, gas, heat, light, water, and electric motor power." We do not go so far as this, but do find that Mr. Nuckols' description of the business conducted by the corporation clearly disclosed that incorporation could only have been had under subdivision 72 of the statute. We found that it was authorized to maintain mills, but the evidence shows it was only engaged in the ginning and ice business. If it did not carry on a mill business of any kind, no contract for the sale of cotton seed could be essential to the transaction of a mill business. As before stated, if it had been shown that it conducted a cotton seed oil business, it would not have followed that it was authorized to conduct a general trading business in cotton seed.

The defendant in error's motion for a rehearing is overruled.