## SEALY OIL MILL & MFG. CO. v. BISHOP MFG. CO.    (No. 271–3498.)

(Commission of Appeals of Texas, Section A. Dec. 14, 1921.)

**1. Corporations ⬅=➡458—Contract to sell cotton seed by corporation engaged in operation of cotton gins held not ultra vires.**

Where it was customary for gin operators to take cotton seed from farmers in exchange for services and to pay them the difference between the value of the seed and the amount charged for services, and where it was essential to secure business to so arrange with the farmers, a contract to sell seed by a corporation incorporated under Rev. St. art. 1121, § 72, engaged in the business of operating gins, was not ultra vires; the corporation having the right to accept seed for its toll charges, and therefore having the right to sell same.

**2. Corporations ⬅=➡370(1)—Has same latitude in transaction of business as individual in same character of business.**

A corporation, in the transaction of its business, has the same latitude as the individual in the same character of business in those things that are essential to the successful operation of that particular business.

**3. Corporations ⬅=➡383—General manager occupies position of general agent and since corporation can act only through agents he is virtually the corporation.**

The general manager of a corporation occupies the position of a general agent, and since the corporation can only act through its agents, the general manager, or general agent, is virtually the corporation itself.

**4. Corporations ⬅=➡400—General manager held authorized to do everything that the corporation itself could do, including execution of contracts notwithstanding by-law.**

General manager of corporation, appointed as such by board of directors and held out to the public as possessing all of the powers of an officer authorized to manage the corporation's business, could do everything in the transaction of corporation's business that the corporation could do in its routine and daily business, including the execution of written contracts, though by-laws required such contracts to be signed by the president and secretary, since such by-law could not bind the public with no knowledge thereof.

**5. Principal and agent ⬅=➡116(1) — Principal bound by act of agent within scope of apparent authority.**

The principal is bound by the act of the agent done within the scope of his apparent authority in dealing with innocent third persons, although such act may be in direct violation of his private instructions.

**6. Principal and agent ⬅=➡116(1)—Powers of agent prima facie coextensive with business intrusted to his care.**

The powers of an agent are prima facie coextensive with the business intrusted to his care, and will not be narrowed by limitations not communicated to the person with whom he deals.

**7. Corporations ⬅=➡399(7)—General manager of corporation operating gins apparently authorized contract to sell cotton seed.**

Where it was customary and essential to the success of its business for cotton gin operators to take cotton seed from farmers in exchange for its services and to pay the farmers the difference between the value of cotton seed and the amount charged for services, the general manager of a corporation operating cotton gins had apparent authority to make contract for sale of cotton seed, where amount contracted to be sold was not so excessive as to require the corporation to go into the open market to buy the seed.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Action by the Sealy Oil Mill & Manufacturing Company against the Bishop Manufacturing Company. Judgment for plaintiff was reversed, and judgment was rendered for the defendant by the Court of Civil Appeals (220 S. W. 203), and plaintiff brings error. Judgment of Court of Civil Appeals reversed and that of district court affirmed.

C. G. Krueger, of Bellville, for plaintiff in error.

G. R. Scott, Boone & Pope and B. D. Tarlton, all of Corpus Christi, for defendant in error.

RANDOLPH, J. The plaintiff, the Sealy Oil Mill & Manufacturing Company, sued the defendant, the Bishop Manufacturing Company, to recover damages for breach of a contract in which the defendant sold and agreed to deliver to plaintiff five cars of cotton seed. The plaintiff recovered judgment in the district court, which judgment the Honorable Court of Civil Appeals for the Fourth Supreme Judicial District reversed and rendered in favor of defendant, and plaintiff thereupon applied to the Supreme Court for a writ of error, which was granted. 220 S. W. 203.

The district court in his findings of fact material to this inquiry found as follows: That the contract sued on was entered into by plaintiff and defendant; that the contract was breached by defendant; that M. Nuckles was the secretary and general manager for defendant; that the board of directors held Nuckles out to the world as their general manager, and that he was such in fact; that the defendant operated a cotton gin at Bishop, Tex., and took cotton seed in exchange for its services rendered to the farmers, and paid the farmers the difference between the value of the cotton seed and the amount charged for its services, and that it had been

engaged in buying cotton seed from farmers ever since its incorporation in 1913 up to the time of trial; that it had been customary and is the universal practice of all persons and corporations owning and operating cotton gins in this state to engage in the purchase of cotton seed and sell the same to oil mills and other parties, and that it was essential for the purposes of their incorporation business for cotton gin owners to do so, and also filed the following conclusions of law of like importance in the decision of this case: That M. Nuckles, as a matter of law, as secretary and general manager for defendant, had authority to make and enter into the contract and to bind the defendant; that the purchase and sale of cotton seed by the defendant was essential to the transaction of its authorized business and for the success of its business; that article 1121, section 72, of Revised Civil Statutes of Texas, under which defendant was incorporated, does not define its powers definitely, nor limit and restrict its powers and authority to any certain, definite, and specific purpose, and that therefore a corporation incorporated under said article and section has authority to do and transact such business and matters as are essential to the transaction of its authorized business, or as is customary and usually done by institutions of like character in furtherance of their business.

The honorable Court of Civil Appeals in reversing the case reversed the judgment of the district court and rendered same for plaintiff upon two controlling propositions: "Whether or not the contract was ultra vires;" and, second, "if it was not, did Nuckles have authority to make the same?" These two propositions are determined by the Court of Civil Appeals by their holding the contract ultra vires, and, further, while they did not consider the solution of that question necessary for the disposition of the case, they hold that the record wholly fails to show authority, actual or apparent, on the part of Nuckles to make the contract. 220 S. W. 203.

[1] Was the contract sued on ultra vires? The evidence shows that the defendant was a corporation, with M. Nuckles as its secretary and general manager, and that it was in the ginning business, operating two gins. It also appears that it was and is customary for gins to contract with parties who have them to do their ginning to pay the toll by selling to the gin the cotton seed from the cotton ginned, and for the gin to pay for the seed in excess of the toll. It appears that Nuckles had been pursuing this course with the knowledge of its stockholders and directors. It is also shown that not only was it customary for gins to do this, but that it was an essential thing to do to secure business. It occurs to us that the direct contact of the ginning officials with the producers, the fact that the cotton and seed being delivered to them by the individual producers and by them separated from the lint, devolves on the gin officials a duty of furnishing a market for the seed so as to assist the producer in disposing of that part of his produce left in the hands of the ginner. In the early history of ginning the disposition of the cotton seed was a great problem for both farmer and ginner, but when it was discovered that the seed had a commercial value, then there grew up the custom of the farmer paying for his ginning by paying his toll in seed. As seed grew in value, it became and is yet customary for the gins to accept the seed to the extent of the toll for ginning, and pay money for the excess. This custom began with the individual ginner, and to limit it to individuals would be to limit the power of corporations engaged in the same business in such a way as to destroy their ability to secure business.

[2] It is our opinion that a corporation in the transaction of its business, the business for which it was organized, has the same latitude as the individual in the same character of business in those things that are essential to the successful operation of that particular business.

The case of North Side Ry. Co. v. Worthington, 88 Tex. 562, 30 S. W. 1055, 53 Am. St. Rep. 778, cited by the honorable Court of Civil Appeals, in our opinion supports this view. In that case the Fort Worth City Company, a corporation organized for the purchase, subdivision, and sale of lands in cities, towns, and villages, owned about 1,400 acres of land lying north and northwest of the city of Fort Worth. This land was laid out in streets, alleys, blocks, and lots for the purpose of selling to settlers and of building it up as a suburb of Forth Worth. The North Side Railway Company was incorporated for the purpose of construction and maintenance of street railways. The street railway was projected to extend from a point in the city of Fort Worth to and through the City Company's property. The testimony tended to show that the street railway was calculated to enhance the value of lots, if not necessary to enable the city company to sell them at a profitable price, and also that it was essential to build up the suburb in order to make the street railway a paying investment. Under these conditions, both corporations needing money for their various purposes, the officers of the two corporations thereupon agreed to issue a series of bonds, 150 in number, and for $1,000 each, to be executed by the two corporations jointly, and to be secured by a mortgage on their property. The bonds were issued and sold at 95 cents on the dollar, and Worthington became the holder of those sued on, 142 in number. The contention was that the execution of those bonds was ultra vires, and they were therefore void. Chief Justice Gaines in his opinion in said

case, after setting out the facts, applies the law to those facts, and from that opinion we have excerpted sufficient to show what he did decide. He says that—

Applying the principles deduced from cases cited by him he is "lead to the conclusion that neither the Fort Worth City Company nor the North Side Street Railway Company had the power to extend its credit to foster the interests of the other company; * * * that the success of one enterprise tended to promote the success of the other was not itself sufficient to authorize the one corporation to aid the other, for the reason that the benefit which was to accrue was not the direct result of the means employed."

In the case at bar the purchase of the cotton seed by defendant conferred a benefit which was the "direct result of the means employed."

Quoting further from Justice Gaines' opinion in the same case:

"In the case of the Fort Worth City Co. v. Smith Bridge Co., 151 U. S. 294, 14 Sup. Ct. 339, the Supreme Court of the United States hold that the contract of the City Company to contribute to the construction of a bridge across a river which separated its lands from the city of Fort Worth was not ultra vires. The court say: 'The object of the creation of the corporation was the acquisition and sale of lands in subdivision, and it cannot be successfully denied that the object would be directly promoted by the use of legitimate business methods to render the lands accessible. This involved the expenditure of money or the assumption of liability; but there is no element in this case of any unreasonable excess in that regard, or the pursuit of any abnormal and extraordinary method.' The same can hardly be said of the transaction developed in the present case. The argument of the court draws a line between such ordinary means as are generally necessary to carry out the purposes of the corporation and such as are abnormal and extraordinary."

We do not think that it can be said under the facts in this case that the taking of the cotton seed as toll by the defendant was an abnormal or extraordinary means of promoting the ginning company's business. Such a practice, as shown by the evidence, was customary with gins, and was really only an incident of the business.

The Supreme Court of Texas, in an opinion by Chief Justice Phillips, in the case of W. C. Bowman Lumber Co. v. Pierson et al., 110 Tex. 543, 221 S. W. 930, 11 A. L. R. 547, cited by defendant in its argument filed in this cause, lays down the rule that—

"Every corporation is created with certain express powers. Being endowed with these express powers, it has the implied power to do whatever is necessary or reasonably appropriate to their exercise. It has, in a word, the authority to do whatever will legitimately affect the express purposes of its creation."

Being of the opinion that, interpreted by the rules laid down in the two cases (North Side Ry. Co. v. Worthington, and Bowman Lumber Co. v. Pierson et al., supra), the contract of the Bishop Maufacturing Company was not ultra vires, we so hold.

[3] The remaining question necessary for determination is: Did Nuckles as general manager have authority to make the contract? The evidence shows that Nuckles was general manager of the defendant; that he transacted the business of that corporation. There is not a particle of evidence that any other officer of the company actively engaged in the business of the defendant. The general manager of a corporation occupies the position of a general agent. As a corporation can only act through its agents, the general manager, or general agent, is virtually the corporation itself. A. & P. Ry. Co. v. Reisner, 18 Kan. 460.

[4, 5] The by-laws of defendant corporation provide for the appointment of no such officer as general manager, but the evidence is undisputed that Nuckles was appointed as such by the board of directors; that he took charge of defendant's business, and was held out to the public as possessing all of the powers of an officer authorized to manage that business. This being true, he could do everything in the transaction of the business of the corporation that the corporation could itself do in its routine and daily business. The testimony of Nuckles that he did not have the authority, or that the directors had not given him the authority, was merely the witness' conclusion, rather than a statement of fact, and cannot overcome the evidence in the case. The by-laws, providing "that all written contracts of importance entered into on behalf of the company such as deeds, mortgages, bonds, etc., shall be signed both by the president and secretary," could not bind the public, when the visible authority was vested in one man, who transacted the business of the corporation for years. The by-laws of the average corporation are not usually open for public inspection; hence the public trading with it can have no notice of their contents. If it should be taken that the by-laws were a limitation upon the authority of the general manager, this is met by proof that the contents of the by-laws were not made known to plaintiff. It is a well-settled rule of law that the principal is bound by the act of the agent, done within the scope of his apparent authority in dealing with innocent third persons, although such act may be in direct violation of his private instructions: Merriman v. Fulton, 29 Tex. 106.

[6] That the powers of an agent are prima facie coextensive with the business intrusted to his care, and that they will not be narrowed by limitations not communicated to the person with whom he deals. Ins. Co. v. Wilkinson, 13 Wall. 235, 20 L. Ed. 617; Morrison v. Ins. Co., 69 Tex. 363, 6 S. W. 605, 5 Am. St. Rep. 63; Niagra Ins. Co.

v. Lee, 73 Tex. 646, 11 S. W. 1024. Having the right to accept seed for its toll charges, it naturally follows as day follows night that the defendant would have the right, to be exercised by its agent, to sell the seed. Anticipating the accumulation of seed in the due course of business, the defendant would just as naturally have the right and power to prepare against loss by providing in advance a market for its commodity. If the defendant in this case did go in the open market to buy seed, it evidently did not buy any with which to fill this particular contract, for it refused to perform the contract, and if it were guilty of illegal acts, or if its agent at any time exceeded his authority, he did not in this instance, for he did not attempt to comply with the contract.

[7] We do not mean to hold that Nuckles was authorized to go into the open market and buy seed. It is not necessary for us to pass upon that question. In this case it appears that in the defendant's ginning business they accepted seed in payment of ginning charges, and we do hold that this act was not ultra vires, and that Nuckles as general manager did not exceed his authority to act for the corporation. Holding this, we further hold that, there being nothing in the nature of the contract of sale which was so excessive in amount as to require the defendant to go into the open market to buy the seed, the plaintiff had the right to presume that the seed would be acquired in the usual course of defendant's ginning business, and it was not necessary to entitle plaintiff to a recovery that it prove that the acquiring of the seed would not be speculative.

We therefore recommend that the judgment of the Court of Civil Appeals be reversed, and the judgment of the district court affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.