COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



PANAMERICAN OPERATING, INC., §

§     No. 08-12-00036-CV

Appellant, §

§     Appeal from the

v. §

§     97th Judicial District Court

MAUD SMITH ESTATE, A TEXAS §
GENERAL PARTNERSHIP,

§     of Archer County, Texas

Appellee. §    (TC#2009-0000028A-CV)

§

## **O P I N I O N**

In this breach-of-contract action, PanAmerican Operating, Inc. ("PanAmerican") appeals from the trial court's judgment in favor of the Maud Smith Estate ("Maud Smith"). In three issues, PanAmerican challenges the sufficiency of the trial court's findings of fact regarding apparent authority and ratification and the correctness of its conclusions of law concerning breach and ratification. We affirm.

### **FACTUAL AND PROCEDURAL BACKGROUND**

Maud Smith is in the business of leasing mineral interests it owns to companies like PanAmerican. To help it acquire leases from mineral owners like Maud Smith, PanAmerican hires landmen as independent contractors. One of the landmen hired by PanAmerican to obtain oil and gas leases from mineral owners in Archer County, Texas was Robert Wormser.

In mid-May 2008, Wormser called William T. Elder, the attorney responsible for negotiating leases on Maud Smith's behalf. Without disclosing that he was an independent contractor, Wormser identified himself as a representative of PanAmerican. Wormser informed Elder that PanAmerican was interested in leasing minerals owned by Maud Smith and the two men began negotiating. After agreeing on terms such as the bonus and royalty payment, Elder asked Wormser to send him an offer in writing. Wormser responded by sending an email to which he attached a form lease. The email, sent from the address "r.wormser@panamop.com" and dated May 28, 2008, read:

> Mr. Elder
>
> Here is the lease form and our offer includes $150.00 per net mineral acre for a 3 year primary term, 1/5th royalty and a 2 yr option at $200.00 per net mineral acre. If you would fill in the lessor's address and make sure i put the correct name on there and if not change it to the capacity they would neet [sic] to sign the lease in.
>
> Thank you
> robert wormser
> 806-535-8576

During the next four days, Elder and Wormser exchanged several emails in which they discussed the lease's format and its contents. Believing the lease had been drafted to both parties' satisfaction, Elder sent Wormser an email on June 2, 2008, accepting the offer and asking for the lease bonus on Maud Smith's behalf. When the lease bonus was not paid promptly, Elder began a two-month campaign to secure its payment. Despite exchanging more emails with Wormser, providing Wormser with a copy of the signed lease, and mailing the original lease to Wormser at PanAmerican's office, Elder failed to obtain the lease bonus.

2

Approximately seven months later, Maud Smith sued PanAmerican for breach of contract and a declaratory judgment alleging it was entitled to the lease bonus and PanAmerican was obligated to pay it. PanAmerican answered, denying Wormser was an employee or held a general power of agency and the communications between Wormser and Elder formed a basis for a contract between Maud Smith and PanAmerican. Only then did Maud Smith learn Wormser was an independent contractor. Following a bench trial, the trial court awarded Maud Smith damages and attorney's fees and, upon PanAmerican's request and prompting, issued findings of fact and conclusions of law.

## FINDINGS OF FACT

In its first and second issues, PanAmerican challenges the trial court's findings of fact concerning apparent authority and ratification.

### *STANDARD OF REVIEW*

Findings of fact in a bench trial have the same force and dignity as a jury's verdict, and we review them for legal and factual sufficiency by the same standards applied in reviewing evidence supporting a jury's answer. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

In reviewing the legally sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). Evidence is legally insufficient when: (1) there is a complete absence of a vital fact; (2) the rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla;

3

or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. Less than a scintilla of evidence exists if the evidence is "so weak as to do no more than create a mere surmise or suspicion" that the fact exists. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 77 S.W.3d 253, 262 (Tex. 2002).

In reviewing the factual sufficiency of the evidence, we consider all the evidence and set aside a finding only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996).

### *APPARENT AUTHORITY*

In its first issue, PanAmerican contends the trial court's findings of fact concerning apparent authority are factually and legally insufficient. We disagree.

### 1. Applicable Law

Apparent authority arises when a principal either knowingly permits its agent to hold himself out as having authority or acts with such a lack of ordinary care as to clothe its agent with indicia of authority. *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). Only the principal's conduct is relevant in determining whether apparent authority exists and it is gauged by the standard "of a reasonably prudent person, using diligence and discretion to ascertain the agent's authority." *Id.* at 182-83. Such conduct, however, "is not limited to spoken or written words . . . . Silence may constitute a manifestation when, in light of all the circumstances, a reasonable

4

person would express dissent to the inference that other persons will draw from silence. Failure then to express dissent will be taken as a manifestation of affirmance." RESTATEMENT (THIRD) OF AGENCY § 1.03, cmt. b (2006).[1]

## 2. Discussion

Evidence adduced at trial established that a reasonably prudent person would have believed Wormser possessed the authority to contract on PanAmerican's behalf because PanAmerican acted with such a lack of ordinary care as to clothe Wormser with indicia of authority.[2]

---

[1] *See generally* RESTATEMENT (THIRD) OF AGENCY § 1.03 cmt. b ("[A]n agent is sometimes placed in a position in an industry or setting in which holders of the position customarily have authority of a specific scope. Absent notice to third parties to the contrary, placing the agent in such a position constitutes a manifestation that the principal assents to be bound by actions by the agent that fall within that scope. A third party who interacts with the person, believing the manifestation to be true, need not establish a communication made directly to the third party by the principal to establish the presence of apparent authority . . . .").

[2] The following are the trial court's findings concerning apparent authority:

> a. Defendant provided Robert Wormser with a PanAmerican Operating, Inc. email address, phone line and physical office, in order to negotiate mineral leases on behalf of Defendant.

> b. As a result of Defendant providing Robert Wormser with a PanAmerican Operating, Inc. email address, phone line and physical office and knowingly allowing him to utilize same on behalf of and in the name of Defendant, Defendant gave Robert Wormser the appearance of an agent/employee of Defendant to Plaintiff and of having the authority which he purported to exercise in negotiations with Plaintiff.

> c. Robert Wormser did utilize the email address, phone line and physical office provided by Defendant in a manner and purpose to benefit Defendant by obtaining an Oil and Gas Lease in Archer County, Texas, in the name of Defendant on Plaintiff's minerals.

> d. Defendant PanAmerican Operating, Inc. failed to require Robert Wormser in his use of the provided email address, phone line and physical office to inform Plaintiff that he lacked authority to bind Defendant in any negotiations or that any agreement reached required approval by any others, which caused Plaintiff to conclude that Robert Wormser actually held the authority which he purported to exercise.

5

It is undisputed that Wormser had authority to obtain oil and gas leases on PanAmerican's behalf and to negotiate terms on its behalf. Geary Trigleth, founder and president of PanAmerican, admitted as much at trial.

It is also undisputed that PanAmerican used Wormser as the point man in obtaining a lease from Maud Smith. Elder testified he dealt exclusively with Wormser in negotiating and finalizing the lease in issue and that they communicated primarily by email. Trigleth conceded not only that PanAmerican provided Wormser with a "@panamop.com" email address, a cubicle in the office, and a company landline to use in his efforts to obtain leases on PanAmerican's behalf, but also he knew Wormser was negotiating a lease with Elder.[3] Indeed, Wormser described his efforts in securing the lease from Maud Smith in reports he was required to submit.

Although disputed by PanAmerican, it is likewise evident PanAmerican endorsed Wormser's actions. Trigleth boasted of his ability to monitor emails to and from PanAmerican's

---

e. Defendant failed to produce any evidence that Defendant required Robert Wormser to disclose that he was not an agent/employee of Defendant, or acting as an agent/employee of Defendant.

f. Defendant knowingly permitted Robert Wormser to negotiate with Plaintiff on the Oil and Gas Lease while utilizing Defendant's address, email domain, and telephone without either requiring Robert Wormser to communicate his lack of binding authority or notifying Plaintiff directly that Wormser lacked such authority.

g. Neither Defendant, nor Robert Wormser, ever notified Plaintiff or its authorized representative that Robert Wormser lacked authority from Defendant.

h. The Plaintiff relied on Robert Wormser's representations of his authority and on Defendant's allowing Robert Wormser to engage in such negotiations on its behalf without a disclaimer of authority.

i. Defendant's conduct clothed Robert Wormser with the indicia of authority that Robert Wormser purported to have.

employees and independent contractors, though denied monitoring Wormser's communications with Elder. Whether true or not, the fact remains that the emails sent by Wormser from his "@panamop.com" email address contain no disclaimers that he was not authorized to negotiate contracts on PanAmerican's behalf and, in fact, suggest otherwise.[4] In his emails to Elder, Wormser repeatedly used the words "we," "us," "our," "they," and "our attorney." Pointedly, one of the emails introduced into evidence by Maud Smith, which was authored by a PanAmerican attorney and dated August 12, 2008, states: "I have gone over all curative with Robert Wormser in detail. This is also to confirm that we now have copies of executed leases on all mineral owners except . . . ." Yet as acknowledged by Trigleth, at no point during the negotiations with Elder or even shortly after PanAmerican received the lease did he or anyone else at PanAmerican inform Maud Smith that Wormser lacked authority to execute a lease on PanAmerican's behalf. It was only when the price of oil dropped precipitously that PanAmerican asserted that Wormser had no authority to execute leases on its behalf.

Thus, from all outward appearances, Elder had no reason to believe Wormser did not have the authority to execute leases on PanAmerican's behalf and nothing in the record indicates PanAmerican dissuaded Elder from so believing.

On appeal, PanAmerican advances four arguments in support of its contention that the trial court erred in finding Wormser had apparent authority to bind PanAmerican. None are persuasive, however.

First, PanAmerican asserts the trial court erroneously considered only Wormser's acts,

---

[3] The email address "r.wormser@panam.op" itself was unremarkable—Trigeleth assigned "@panamop.com" email addresses to all PanAmerican officers, employees, and independent contractors.

7

rather than those of PanAmerican, and, further, there was no evidence Maud Smith relied on PanAmerican's conduct to believe Wormser had apparent authority. This assertion is belied by our discussion of the evidence.

Second, PanAmerican contends that as a matter of law, the "@panamop.com" email address provided to Wormser did not cloak Wormser with apparent authority. In support of its contention, PanAmerican cites *CSX Transp., Inc. v. Recovery Express, Inc.*, 415 F.Supp.2d 6 (D. Mass. 2006), as authority. PanAmerican's reliance on *CSX* is misplaced, however.

At its core, *CSX Transp., Inc.* is a case about a credulous third party who is taken advantage of by a scheming individual with no formal business relationship to the entity sued. In that case, CSX received an email from an individual stating he was from Recovery Express and another entity and interested in purchasing rail cars for scrap. 415 F.Supp.2d at 7. After a few subsequent phone calls, CSX delivered the rail cars to the individual, who disassembled and transported them away. *Id*. at 7-8. When the individual's check bounced, CSX sought recovery from Recovery Express and the other entity. *Id*. at 8. However, by the time suit was brought, the other entity was no longer in existence allegedly because of fraudulent conduct by the individual. *Id.* at 8 n1. CSX asserted Recovery Express, with which the individual and the other entity shared office space, was liable as a principal because Recovery Express had assigned the individual an email address containing its domain name. *Id*. at 8-9. In concluding apparent authority did not exist because CSX's inference of the individual's authority was unreasonable as a matter of law, the federal district court reasoned: "Granting an e-mail domain name, by itself, does not cloak the recipient with carte blanche authority to act on behalf [of] the [grantor]. Were this so, every

8

subordinate employee with a company e-mail address – down to the night watchman – could bind a company to the same contracts as the president." *CSX Transp., Inc.*, 415 F.Supp.2d at 11.

This case, on the other hand, is about a principal who employs an agent to carry out its business but, regretting the outcome of the agent's actions, opportunistically denies the agent acted with authority. PanAmerican, unlike Recovery Express, had a formal business relationship with its agent, knew its agent would be contacting third parties on its behalf for the express purpose of carrying out its business objectives, and outfitted him with the tools necessary to accomplish his task. As discussed above, these tools included more than just an email address and gave rise to the reasonable inference that Wormser was authorized to execute leases on PanAmerican's behalf. Moreover, unlike CSX, Elder dealt frequently and extensively with the purported principal's agent in consummating the deal and in seeking payment, receiving numerous emails from that agent informing him that once "they" resolved some issues payment would be forthcoming. As noted above, PanAmerican asserted Wormser had no authority to execute leases on its behalf only after the price of oil had dropped precipitously.

Third, PanAmerican posits the trial court erred in "presum[ing] that PanAmerican had an affirmative obligation to require its independent contractor agents to expressly disclaim authority . . . when dealing with third parties" because "[t]hat is not the law in Texas." However, not only does PanAmerican fail to cite any authority in support of its position, it is also wrong. *See Funderburg v. Sw. Drug Corp.*, 210 S.W.2d 607, 610 (Tex.Civ.App.--Fort Worth 1948, no writ)("When an agent acts within the apparent scope of his authority, a duty rests upon his principal to give notice of any limitations which affect the rights of parties dealing with the agent,"

9

*citing* TEX.JUR.2d p. 408, sec. 24); *Sealy Oil Mill & Mfg. Co. v. Bishop Mfg. Co.*, 235 S.W. 850, 852 (Tex.Comm'n App. 1921, opinion adopted)("That the powers of an agent are prima facie coextensive with the business intrusted to his care, and that they will not be narrowed by limitations not communicated to the person with whom he deals.").

Fourth, PanAmerican argues Elder's belief that Wormser had apparent authority was unreasonable and his reliance on this belief was unjustifiable. In support of this argument, PanAmerican cites case law holding that a third party who fails to ascertain both the fact and the scope of an agent's authority cannot rely on apparent authority. *See e.g., Humble Nat. Bank v. DCV, Inc.*, 933 S.W.2d 224 (Tex.App.--Houston [14th Dist.] 1996, writ denied); *Suarez v. Jordan*, 35 S.W.3d 268 (Tex.App.--Houston [14th Dist.] 2000, no pet.). However, these cases are distinguishable and thus inapposite. In *Humble Nat. Bank*, the third party knew that the agent was not the individual who had authority to cash checks for the principal. 933 S.W.2d at 237-38. Here, Maud Smith did not know that Wormser could not execute a lease on PanAmerican's behalf. In *Suarez*, there was no evidence whatsoever suggesting that a son who signed a settlement agreement signed it on his father's behalf. 35 S.W.3d at 273-74. Here, there was ample evidence suggesting that Wormser had the apparent authority to bind PanAmerican to a lease negotiated by him.

Having disposed of PanAmerican's arguments, we hold that the evidence is legally and factually sufficient to support the trial court's finding that PanAmerican clothed Wormser with the indicia of authority he purported to have and on which Maud Smith relied by knowingly failing to take any action to dissuade Elder from believing Wormser had the authority to bind PanAmerican.

*See Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 550-52 (Tex.App.--Houston [14th Dist.] 2003, no pet.)(holding that individual who helped obtain a bond for the principal had apparent authority to negotiate or contract on principal's behalf because most of the negotiations were conducted through the individual, the individual was actively involved in securing the bond, and the individual's efforts were accepted and ratified by the principal.)

Issue One is overruled.

### *RATIFICATION*

In its second issue, PanAmerican argues the trial court's findings of fact regarding ratification are factually and legally insufficient. We disagree.

### 1. Applicable Law

Ratification is the adoption or confirmation, by a party with actual knowledge of all material facts, of a prior act that did not then legally bind that party and which that party had a right to repudiate. *Thomson Oil Royalty, LLC v. Graham*, 351 S.W.3d 162, 165 (Tex.App.--Tyler 2011, no pet.). A party ratifies a contract by acting under it, performing under it, or affirmatively acknowledging it. *Id*. at 166. Where silence is the basis of ratification, the party seeking to hold a principal liable for an unauthorized act of his agent must show that the principal had knowledge of all material facts. *Thermo Products Co. v. Chilton Independent School District*, 647 S.W.2d 726, 733 (Tex.App.--Waco 1983, writ ref'd n.r.e.); *Diamond Paint Company of Houston v. Embry*, 525 S.W.2d 529, 535 (Tex.Civ.App.--Houston [14th Dist.] 1975, writ ref'd n.r.e.). The critical focus is on the actions taken by the party seeking to avoid a contract after he or she becomes aware of the contract. *Thomson Oil Royalty*, 351 S.W.3d at 166.

11

## 2. Discussion

The evidence shows that PanAmerican was aware of the circumstances surrounding the acquisition of the lease in dispute and chose not to repudiate the validity of the lease until doing so approximately three months after receiving the lease.[5]

It is undisputed that PanAmerican received the lease in issue. Elder testified he mailed the original signed lease to Wormser at PanAmerican's business address. In an email, counsel for PanAmerican acknowledged the lease had been received by PanAmerican and Trigleth did not contend otherwise at trial. So too is it undisputed that PanAmerican did not repudiate the lease immediately after receiving it, but instead remained silent for a number of months afterwards. As demonstrated above in our discussion of apparent authority, PanAmerican knew of all the material facts surrounding Wormser's acquisition of the mineral lease. Thus, by keeping the lease and

---

[5] These are the trial court's findings on ratification:

a. Plaintiff emailed a copy of the signed Oil and Gas Lease to Defendant on June 2, 2008.

b. Plaintiff sent the original signed Oil and Gas Lease to Defendant on or about July 21, 2008.

c. Defendant's prior counsel, Mr. Buchan, acknowledged receipt of the Oil and Gas Lease on August 12, 2008.

d. Defendant received and retained the Oil and Gas Lease after being made fully aware of the terms surrounding the Oil and Gas Lease.

e. Defendant failed [to] take any action to dispute the validity of the Oil and Gas Lease within a reasonable time.

f. Defendant failed to return the original Oil and Gas Lease within a reasonable time.

g. Defendant's possession of the Oil and Gas Lease prevented Plaintiff from leasing its mineral rights to a third party or from mitigating their damages.

failing to repudiate it when presented with the opportunity to do so, PanAmerican affirmatively acknowledged its validity, thereby ratifying it.

PanAmerican contends the trial court's findings are factually insufficient because there is no clear evidence PanAmerican intended to ratify the lease. But Maud Smith was required to demonstrate only that PanAmerican performed an intentional act that was inconsistent with any intention to avoid the lease. *Old Republic Ins. Co., Inc. v. Fuller*, 919 S.W.2d 726, 728 n.1 (Tex.App.--Texarkana 1996, writ denied). As recognized by this Court, that intent may be inferred from the acceptance of benefits under the lease after having full knowledge of the act that would make the lease voidable. *See Williams v. City of Midland*, 932 S.W.2d 679, 685 (Tex.App.--El Paso 1996, no pet.)(stating that intentional ratification may be shown by party's acceptance of benefits under agreement, after becoming fully aware of fraud). The benefit PanAmerican received here was obtaining a signed lease without having to pay until PanAmerican could determine whether, based on the future price of oil, it made economic sense to honor the lease.

Second, PanAmerican asserts the trial court's findings are legally and factually insufficient because the record does not reflect "that PanAmerican, as an entity, had full knowledge of the terms of the agreement." This assertion is belied by Trigelth's testimony that as president and founder of PanAmerican, he knew Wormser was negotiating a lease with Elder and by the email authored by the PanAmerican attorney confirming that PanAmerican had copies of executed leases on all mineral interest owners except one.

13

Third, PanAmerican argues the trial court's findings are legally and factually insufficient because PanAmerican "never received, much less retained, a benefit." As mentioned above, PanAmerican received the benefit of a signed lease to minerals it could have developed had it made economic sense to do so.

Having disposed of PanAmerican's arguments, we hold that the evidence is legally and factually sufficient to support the trial court's finding that PanAmerican ratified the lease by failing to take any action to dispute its validity after receiving the lease with full knowledge of the circumstances surrounding its acquisition.

Issue Two is overruled.

### CONCLUSIONS OF LAW

In its third and final issue, PanAmerican contends the trial court's conclusions of law that PanAmerican ratified and breached the contract are clearly erroneous because the evidence supporting these conclusions is legally and factually insufficient. We disagree.

We review a trial court's conclusions of law *de novo* and uphold them if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). Although a trial court's conclusions of law may not be challenged for factual sufficiency, we may review the legal conclusions drawn from the facts to determine whether the conclusions are correct. *Marchand*, 83 S.W.3d at 794. If a conclusion of law is erroneous, but the trial court nevertheless rendered the proper judgment, the error does not require reversal. *Id*.

14

As demonstrated above, the evidence adduced at trial was legally and factually sufficient to support the trial court's finding of fact supporting its conclusions of law. The trial court's conclusions are therefore correct.

Issue Three is overruled.

## CONCLUSION

Having overruled all three of PanAmerican's issues, we affirm the judgment of the trial court.

July 24, 2013

YVONNE T. RODRIGUEZ, Justice

Before Rivera, J., Rodriguez, J., and Larsen, J. (Senior Judge)
Larsen, J. (Senior Judge)(Sitting by Assignment)

15