**RHOTON et al. v. TEXAS LAND & MORT-GAGE CO., Limited, et al.**
**No. 1368.**

Court of Civil Appeals of Texas. Eastland.
Feb. 8, 1935.

Rehearing Denied March 15, 1935.

See, also (Tex. Civ. App.) 56 S.W.(2d) 678.

Woodward & Coffee, of Big Spring, and T. L. Price, of Post, for appellants.

Wagstaff, Harwell, Wagstaff & Douthit, of Abilene, and Coke & Coke, of Dallas, for appellees.

HICKMAN, Chief Justice.

Appellants D. A. Rhoton and wife, Fannie Rhoton, and Southland Royalty Company brought this suit against appellees the Texas Land & Mortgage Company, Limited, hereinafter called the Mortgage Company, L. C. Harrison, T. F. Hunter, J. B. Harrison, Fred Read, Hugh Corrigan, W. J. Garrett, and G. E. Lockhart, seeking to recover about 5,750 acres of land. In a nonjury trial judgment was rendered that appellants take nothing, and that the appellees recover on their cross-actions, and this appeal followed.

All parties claimed title under appellants Rhotons as the common source of title. The Mortgage Company's title is based upon (a) a quitclaim deed from D. A. Rhoton and wife, Fannie Rhoton, to it; (b) an agreed judgment in the district court of Howard county; and (c) a trustee's deed from W. James Mitchell, substitute trustee, to the Mortgage Company—all these instruments being dated February 7, 1933. The other appellees hold under the Mortgage Company. The appellants attacked all the instruments relied upon by the Mortgage Company upon the ground that they were obtained through fraudulent acts and conduct on the part of the defendants G. E. Lockhart, T. F. Hunter,

and L. C. Harrison, and sought to have them canceled and set aside, and thus vest title in themselves. The appellant Southland Royalty Company further alleged that the trustee's sale and deed above referred to were void as to it, and that title to the mineral interests held by it in the lands was never divested out of it. The court, upon request of appellants, prepared and filed findings of fact and conclusions of law, in which all of the material facts were found against appellants, and in which the special defenses of the appellees were sustained. Among these findings were the following: "I further find that in the negotiations on the part of Hunter and Harrison, with the Rhotons, that no fraudulent representations or concealments of any kind, at any time, were made by either Harrison or Hunter to the Rhotons, in order to procure said contract, or in order to procure the sale of the property on the 7th day of February, 1933, or in order to procure the quit claim deed from the Rhotons, which was introduced in evidence, or to procure and agree to the judgment entered in the District Court of Howard County, Texas, in cause No. 143, same being in the record, to which reference is here made; and I further find that the said Hunter and the said Harrison were at no time guilty of actual or constructive fraud to the Rhotons. I further find that G. E. Lockhart made no false representations, or concealments to the Rhotons in any of the negotiations between the said Rhotons and the said Lockhart after the first of January, 1933, and that the said G. E. Lockhart did not make any false representations or conceal anything from the Rhotons, and was not guilty of fraud in the transactions towards the Rhotons, either actual or constructive."

Manifestly, if these findings of the court are upheld, they afford support for the judgment as against the appellants Rhotons. They have assumed the burden in this court of establishing, not only that the evidence would have supported contrary findings, but that there was no evidence supporting the court's findings, and that, as a matter of law, fraud was perpetrated upon them by the named persons. They have assumed the further burden of establishing, as a matter of law, that Harrison was the agent of the appellee Mortgage Company. The assignments have caused us to make a careful study of the statement of facts, which facts have been considered in the light most favorable to the appellees, and our conclusion is that there is evidence supporting these findings.

On December 6, 1926, the Rhotons executed a deed of trust to A. G. Wood, trustee for the use and benefit of the Mortgage Company. In March, 1932, W. James Mitchell, acting as substitute trustee under the deed of trust, advertised said lands for sale on April 5, 1932. On April 2, 1932, the Rhotons employed G. E. Lockhart, of Lubbock, as their attorney to institute a suit enjoining the sale as advertised, and at the same time executed and delivered to Lockhart a warranty deed to an undivided one-half interest in the lands as his fee. On that same day Mr. Lockhart prepared a petition seeking an injunction against the sale of said lands by the substitute trustee, the petition alleging that the deed of trust was void for reasons not material to this suit. This petition was presented to the district judge, upon the basis of which he granted a temporary restraining order. At the same time a hearing was set for the 23d day of April, 1932, to determine whether an injunction pendente lite should issue. At this hearing the injunction was refused, but, the Rhotons having given notice of appeal to this court, the order provided that the temporary restraining order theretofore granted should remain in full force and effect pending appeal in so far as four sections of the land were concerned. The appeal was duly perfected to this court, but, by order of the Supreme Court on equalization of the dockets of the several courts of civil appeals, the case was transferred to the Court of Civil Appeals at Amarillo for hearing, and on January 4, 1933, that court affirmed the judgment of the trial court without making any decree as to the temporary restraining order kept in force by order of the trial court pending the appeal. 56 S.W.(2d) 678. A motion for rehearing was timely filed on behalf of the Rhotons, but was overruled on February 8, 1933.

During this time there resided in Howard county a man named A. M. Sullivan, whose business was described as a commission business. He testified that before the injunction suit was filed by Lockhart on April 2, 1932, he began to undertake, as the agent and representative of the Rhotons, to procure an oil and gas lease on this land, with the hope of enabling them to discharge the indebtedness held by the Mortgage Company. That in the fall of 1932 he began to try to interest the appellees L. C. Harrison and T. F. Hunter in the proposition. They became interested in procuring a lease on this land, and on the 9th day of January, 1933, five days after the judgment of affirmance had been entered by the Court of Civil Appeals at Amarillo, a written contract was entered into between the Rhotons and Sullivan, as parties of the first part, and L. C. Harrison, as party of the second part. This contract recited that the Mortgage Company was attempting to sell the land here involved under the terms of their deed of trust, and that a suit restraining the sale was pending. It further recited that Harrison had negotiated with all parties to said suit for an option to purchase the fee title to said land, and for an oil and gas lease thereon. The contract obligated Harrison to begin the drilling of a well on the land within sixty days after he should procure an oil and gas lease thereon from the Mortgage Company, together with an option for a period of six months to buy the land in fee for an amount equal to the total indebtedness against same, including unpaid taxes and court costs, and compilation of an abstract, and to prosecute the drilling thereof with reasonable diligence to a depth of 3,000 feet, or to where oil and gas was found in paying quantities at a lesser depth. It was further provided that if, after he procured the oil and gas lease and the six months' option from the Mortgage Company, he should fail within five months of said time to exercise his option to buy the fee title, then the Rhotons and Lockhart should have the right to exercise the option at any time during the sixth month thereof. A further provision of the contract was that, in the event Harrison should procure the oil and gas lease and the option to purchase, and should exercise that option, he would then convey and set over unto the first parties two-tenths of one-eighth of the oil, gas, and other minerals produced, saved, and marketed from said land. In consideration of the premises the Rhotons agreed to join with the Mortgage Company in dismissing the pending cause and to withdraw their protests to the sale of the land under the deed of trust. This contract recited in its opening paragraph that it was made by and between D. A. Rhoton and wife, Fannie Rhoton, and A. M. Sullivan, all of Howard county, and G. E. Lockhart, of Lubbock county, Tex., parties of the first part, and L. C. Harrison, of Howard county, Tex., party of the second part. T. F. Hunter drew the contract and had a third interest with Harrison in the project. Just why Sullivan should have joined as a party of the first part is not made clear by the record. This contract was duly executed by the Rhotons, Sullivan, and Harrison, and was presented by Hunter to Lockhart for his signature in

Lubbock. Until this contract was presented to him, Lockhart had no knowledge of its existence, or of any pending negotiations between the Rhotons and Sullivan with Harrison and Hunter. He read the contract and declined to execute it. Later a man named Edwards, whose interest in the matter does not appear from the record, visited Lockhart and proposed to him that, if he would execute this contract, Harrison would buy his interest therein for $1,500. Lockhart agreed to this proposition, and the fact of his agreement having been made known to Hunter, he later returned to Lubbock with the contract, at which time it was executed by Lockhart. Simultaneously with the execution and delivery of this contract Lockhart wrote and delivered to Hunter the following letter:

"Lockhart & Brown
"Lawyers
"Lubbock, Tex., Jan. 14, 1933.
"Mr. T. F. Hunter,
"Wichita Falls, Texas.
"Dear Sir:

"I have this day executed and acknowledged a contract between D. A. Rhoton, Fannie Rhoton and myself, parties of the first part, and L. C. Harrison, party of the second part, involving nine sections of land in Howard County, Texas, described in this contract, and deliver said contract to you with the understanding that the same is not effective, and will not become in operation and binding upon me until either Mr. Harrison or yourself enters into a drilling contract with the Texas Land & Mortgage Company, satisfactory to yourself, and this contract is further conditioned that Mr. Harrison will execute and deliver to me two notes, one for the sum of $500 to be paid 30 days after date, and one for the sum of $1,000 to be paid ninety days after date, and that I, for this consideration, will transfer my interest in said contract to whoever Mr. Harrison may designate, and in addition, if required will give a quit claim deed to said lands, and dismiss the suit now pending on appeal in the court of civil appeals from the District Court of Howard County; it being understood that said dismissal to be conditioned upon the release by the mortgage company of any liability on the part of the principals and sureties on the injunction or stay bond now filed in said cause.

"Yours very truly,    G. E. Lockhart."

The next efforts of Harrison and Hunter were directed toward the procurement of a contract with the Mortgage Company, and resulted in the execution of a written contract, dated February 4, 1933, between L. C. Harrison, as first party, and Texas Land & Mortgage Company, Limited, a corporation, as second party, wherein Harrison, on his part, agreed that on or before 3 o'clock p. m. on Tuesday February 7, 1933 (the date on which the land was re-advertised for sale after the rendition of the judgment by the Amarillo Court of Civil Appeals on January 4, 1933), to perform each and all of the following things: (1) To cause an order of dismissal to be entered on the motion for rehearing in the Court of Civil Appeals; (2) to cause an agreed judgment to be entered in the district court of Howard county in the case in which the injunction had been refused; (3) to pay all court costs incurred in the proceedings; and (4) to procure the execution by the Rhotons, and to deliver to the Mortgage Company, a quitclaim deed to all the land in litigation. In the event all of the above conditions were performed by Harrison, the Mortgage Company obligated itself as follows: (1) To cause the trustee to sell the land at the courthouse door of Howard county before 4 o'clock p. m., Tuesday, February 7, 1933. (2) At such sale to bid such amount, not exceeding the sum of $50,903 (its claim against same), necessary to purchase said property. (3) In the event the Mortgage Company should become the purchaser at such sale, then it agreed: (a) To execute and deliver to Harrison an oil and gas lease upon all of this land in the form shown by an exhibit attached to the contract; (b) to execute, acknowledge, and deliver to Harrison an agreement giving to him an option for six months to purchase said land in fee; (c) to execute and deliver to D. A. Rhoton a grass lease on a part of the property, such lease to be in the form shown by an exhibit attached to the contract; and (d) to deliver a release to the Rhotons from all liability on account of the notes theretofore executed by them to the Mortgage Company.

The parties at interest met at Big Spring on February 7, 1933, at which time an agreed judgment was entered in the district court dismissing the suit in which the temporary injunction had been sought, and a quitclaim deed was executed, acknowledged, and delivered by the Rhotons to the Mortgage Company conveying all the land in controversy. The sale was made by the substitute trustee, at which the Mortgage Company was the highest bidder and a trustee's deed was executed and delivered by the substitute trustee to it. Thereafter the Mortgage Company, in accordance with its contract, executed and delivered the oil and gas

lease, option agreement, and grazing lease and release of liability above mentioned. Harrison sold various interests in the lease to other persons appearing as appellees in this case, and proceeded with the drilling of the well. About the end of the fifth month after the procurement of the option agreement, Harrison notified the Rhotons that he was unable to raise the money with which to exercise his option to purchase this land in fee, and that the Rhotons had one month within which to do so. They were likewise unable to raise the money and the option, therefore, expired. The grass lease, being for the same length term as the option, likewise expired at the same time. The rights of the Rhotons and Lockhart to royalty being contingent upon the exercising by Harrison of his option to purchase this land in fee, and that contingency never having happened, nothing was realized therefrom.

The next step in the proceedings was an action brought by the Mortgage Company against the Rhotons in the United States District Court at Abilene in the form of trespass to try title, to which the Rhotons answered, "Not guilty." Upon a trial judgment was entered in favor of the Mortgage Company, from which judgment no appeal was prosecuted. After that the instant suit was filed seeking the cancellation of the quitclaim deed and the trustee's deed and the vacating of the agreed judgment entered in the district court. As above noted, these instruments were sought to be canceled and the judgment vacated on the ground of fraud by concealment practiced upon the Rhotons by their attorney, G. E. Lockhart, and by Harrison and Hunter. The findings of the court on the issue of fraud are copied above.

In full recognition of the rule that the utmost good faith is required of an attorney in his dealings with his clients, we cannot sustain the contention that these findings are without support in the evidence. Mr. Rhoton did not testify, but Mrs. Rhoton, in her testimony, acknowledged the validity of the debt, and of the lien securing same, and stated that the purpose of employing an attorney was to stay the foreclosure until they could refinance the debt. She stated that there was then "talk of a moratorium" and that she thought if, by an injunction, a sale of the property could be prevented until the proposed moratorium statute could be enacted, then, in all probability, they could refinance their indebtedness. If delay for an opportunity to refinance was the only benefit she expected to receive, the results abundantly fulfilled her expectations. The sale was advertised to take place on April 5, 1932. The temporary restraining order was procured, and, although the injunction pendente lite was refused, the stay order was continued in effect pending the appeal. The case, as above noted, was transferred after appeal from this court to the Amarillo court. A motion to advance was made in that court by the Mortgage Company, but there was a rule adhered to in that court that such motions would not be granted on transferred cases except by agreement of both parties, and so Lockhart declined to make the agreement, thereby keeping the restraining order in effect until January 4, 1933, and preventing a sale until February 7, 1933. By virtue of the option contract and grass lease, a further delay was obtained until August, 1933. It is not perceived how a longer delay than sixteen months could have been in the contemplation of the Rhotons at the time they employed their attorney.

The execution of the quitclaim deed and the agreed judgment on February 7, 1933, was but the fulfillment of the contract which the Rhotons entered into on January 9, 1933, as to the execution of which Lockhart was not consulted. The first he knew of pending negotiations between his clients and Harrison and Hunter was when the contract already executed by the Rhotons was presented to him for his signature. It probably appeared to him that his clients had concluded to undertake to save themselves by procuring the drilling of an oil well on their land. He testified that he was not an oil man, and did not care to take a chance on discovering oil. It is not contended that, directly or indirectly, the Rhotons were influenced in signing this original contract by any act, word, or deed of their attorney. Sullivan testified:

"To be frank with you, Mr. and Mrs. Rhoton and myself were very anxious to get this deal over for the simple fact that we believed there was big oil down here and could get big money and they were as anxious as I was and I was tickled to get Lockhart out as he refused to sign the contract. I really wanted him to lose, as he didn't believe there was oil there and I did and Mr. and Mrs. Rhoton thought if we could get oil down there we could step out and finance it, but didn't do it.

"Q. You didn't express that you were glad Lockhart was out to the Rhotons, did you? A I said I thought Lockhart was going to blow up the deal and they said 'why' and I said he didn't like it some way and I believed he was going to blow it up, and in a

few days I went back and told them I thought the deal was going over and they said they were glad of it."

And again:

"Q. Didn't it occur to you they might have signed that depending on G. E. Lockhart to help them handle that proposition and that Lockhart had sold out on them and they were helpless without somebody helping on the transaction? A. That proposition was discussed very thoroughly quite a number of times and explained to Mr. and Mrs. Rhoton that, if this option went through, they would get anywhere from nothing on up. We didn't know what it would be worth. If the option wasn't exercised by Harrison or them, they wouldn't have anything and they signed the contract, at the same time stating, 'Well we got a chance this way and the other way we haven't. They are going to foreclose on us anyway and we got six months more time to do something with it.'"

On February 7, 1933, the day the various instruments sought to be canceled were executed, Mr. Lockhart visited the Rhotons in their home upon their invitation. As to the advice given by him to them on that occasion, Sullivan testified as follows: "He told them if the deal suited them and if they wanted to take the chance—the only thing that seemed to bother Mr. and Mrs. Rhoton that day was whether Harrison would drill the well and he told them he didn't think there was any necessity of them worrying about that."

And Lockhart testified:

"As I remember it—I might be mistaken about some of the details—as I remember it, we went up there and think we had all the papers with us. My recollection is all the papers were there at the time and we discussed the various papers. But there weren't any papers signed at that time, as there was no Notary Public. We must have been there some thirty minutes, because we did go into detail and discuss all these matters.

"Q. You did explain to them what the situation was and the desperate condition the litigation was in? A. Yes, I certainly did. They understood they had already lost the case in the higher courts and I told Mrs. Rhoton and Mr. Rhoton there that day, 'I don't think anything of this contract at all, but probably you people think more of it than I do and of the oil possibility more than I do,' and I said if Mr. Harrison—the only trouble it seemed with them was that they were afraid he wouldn't drill a well, and I said, 'I don't know whether he will or not, but believe he will and, if that is the only hitch, I wouldn't be uneasy, but you must remember that if he drills a well and gets one of a thousand barrels, you haven't anything on earth unless he goes ahead and exercises this option. It all depends on him exercising the option, but,' I said, 'if he gets a big well and doesn't exercise it, then probably you won't have any trouble in financing it yourself,' I said, 'I don't think much of it myself, but it is probably better than what you got. We have already lost in the court and you haven't anything here that I can see.'

"Q. That statement you made to them and advice, if it is called advice, was it made in good faith? A. It certainly was. I never asked them to sign anything. I said, 'You have already signed this contract of January 7th. You have signed and acknowledged that and, if you are going through with that contract, it is necessary to sign these other papers because you agreed in that contract to do these different things and it is perfectly all right to sign all these other papers, if you are going to carry out the contract you made.'"

Considering the evidence as a whole, we conclude that the finding that no fraud was perpetrated by Lockhart upon his clients should not be disturbed. Regarding the fraud charged against Hunter and Harrison but little need be written. If Lockhart was not guilty of fraud, manifestly they were not. Even if they were under some kind of duty to disclose to the Rhotons, the record does not show that they knew that Lockhart had not informed his clients that he had parted with his interest. The only possible theory under which the Mortgage Company could be affected by any fraud would be that Harrison committed fraud and that he was its agent. Harrison was not its agent and committed no fraud.

Independently of every other consideration, we fail to see the existence of the element of damage suffered by the appellants sufficient to maintain the action for cancellation. They had no rights recognized by law. Their purpose was delay only, and the sale by the substitute trustee on February 7, 1933, was in no wise dependent upon any contracts or agreements. No way is suggested by the record whereby the attorney could have prevented that sale from being made on that day.

No further reason is required for affirming the judgment against the Rhotons, but since the court sustained appellees' plea

of res judicata, and that question is elaborately briefed, we have concluded to dispose of it. On November 22, 1933, a judgment was rendered in the District Court of the United States for the Northern District of Texas, at Abilene, in favor of the Mortgage Company against the Rhotons for the lands and premises in controversy. In that case the Mortgage Company was plaintiff, and the action was in the form of trespass to try title, to which the Rhotons pleaded "not guilty." Prior to that time the Rhotons had executed, acknowledged, and delivered to the Mortgage Company a quitclaim deed to this land, and the substitute trustee had likewise executed, acknowledged, and delivered to it a trustee's deed thereto; these instruments being dated February 7, 1933. The quitclaim deed is being attacked in the instant suit upon the ground of fraud in its procurement. There is a question in the minds of some members of this court as to whether, under the holding in Moore v. Snowball, 98 Tex. 16, 81 S. W. 5, 66 L. R. A. 745, 107 Am. St. Rep. 596, the pleadings in the federal court put in issue the right of the Rhotons to have this deed canceled for fraud. We shall not, therefore, pass upon that question; but, independently of that deed, the Mortgage Company was claiming under the trustee's deed, which appellants claim is void, not by reason of any equitable attacks which they make upon it, but because (1) there was an injunction outstanding against the sale when it was made, and (2) the substitute trustee was not properly appointed. We all agree that these defenses were put in issue by the pleadings in the federal court, and that, therefore, the judgment of that court is res judicata of the issue of title presented in the instant suit.

The appellant Southland Royalty Company acquired an interest in the minerals under this land from the Rhotons after the deed of trust to the Mortgage Company was executed. It was not a party to the suit in the federal court and here seeks to avoid the sale under the deed of trust as to it on two grounds: (1) That W. James Mitchell was not properly appointed as substitute trustee under the deed of trust; and (2) that the sale by him passed no title, because an injunction against such sale was outstanding at the time the sale was made. We shall consider these contentions in their order.

The deed of trust contained this provision: "And should the said A. G. Wood, Trustee, be absent from the State, or fail or refuse, or be disqualified from acting hereunder, the legal holder or holders of said notes, or the General Manager, or Acting General Manager of aforesaid Mortgage Company shall have full power to appoint a substitute, in writing, without notice to us, who shall have the same powers which are hereby delegated to the said A. G. Wood, Trustee, and we do hereby absolutely ratify and confirm any and all acts that the said Trustee, or his successor in this trust, may lawfully do in the premises by virtue hereof."

The trial court found that on March 10, 1932, James C. Macdonald was general manager of the Mortgage Company, and that W. James Mitchell was appointed substitute trustee according to the terms of the deed of trust. A person authorized under a deed of trust to appoint a substitute trustee cannot delegate his power to make such appointment. Michael v. Crawford, 108 Tex. 352, 193 S. W. 1070; Holcomb v. Nettleton (Tex. Civ. App.) 35 S.W.(2d) 745. The reason for the rule is that the mortgagor has conferred a discretionary power upon a person whom he is willing to trust to execute it, and that, it being a power involving discretion, it cannot be delegated to another, since the one to whom it is delegated might not be acceptable to the mortgagor. Appellants concede that, had the general manager, as such, made the appointment, he would have been authorized to do so by the provision of the deed of trust above copied, but contend that, the designation having been made, not by the general manager, as such, but by the beneficiary, through its general manager, it should have been executed by the president and secretary of the corporation. The brief of appellee Mortgage Company answers this contention so clearly that we adopt a portion thereof as follows: "Appellants argue that materiality should be attached to whether the appointment is executed by James C. Macdonald, General Manager of The Texas Land & Mortgage Company, Ltd., or The Texas Land & Mortgage Company, Ltd., by James C. Macdonald, General Manager. The point is tenuous. In either instance, it is a particular person, namely, the General Manager, doing a particular act in a representative capacity. A General Manager without something to manage is a paradox. He must be a General Manager of something and in this instance it was of the Mortgage Company. It was in his representative capacity, as General Manager of the Mortgage Company, that the deed of trust authorized him to act."

But, independently of this, the act done on behalf of a corporation by its general manager does not involve the delegation by the corporation of power and authority to do the act. The record shows, and the court found,

that Macdonald was the general manager of the Mortgage Company, and no further proof of execution by the corporation was required. Booker-Jones Oil Co. v. Nat. Ref. Co., 63 Tex. Civ. App. 142, 131 S. W. 623, 132 S. W. 815; Sealy Oil Mill & Mfg. Co. v. Bishop Mfg. Co. (Tex. Com. App.) 235 S. W. 850; C. J., 14A, p. 94, Id. 539.

■■■ Neither do we uphold the contention that the sale by the substitute trustee was invalid, because made in violation of an injunction. · The temporary restraining order was issued April 2, 1932. The hearing on the application for temporary injunction was had on April 23, 1932, at which time the application was refused. The plaintiffs therein, appellants here, having excepted to the court's ruling and given notice of appeal, it was ordered that "this order refusing said temporary injunction is suspended pending appeal in so far as it affects the property hereinafter described, and it is further ordered that the temporary restraining order to be effective, however, only in so far as it restrains defendants from selling, or attempting to sell, the following described lands." The judgment of the Court of Civil Appeals entered on January 4, 1933, affirmed the judgment of the trial court, without making mention of the restraining order. The motion for rehearing in the Court of Civil Appeals was overruled the day after the trustee's sale. It is not clear to us just what order was intended to be made by the trial judge on April 23rd. He refused the application for temporary injunction, but suspended the order of refusal pending appeal. The effect thereof seems to be regarded by counsel as both refusing to grant and granting an injunction pendente lite. It is now declared to be the rule in this state that an order of a Court of Civil Appeals dissolving a temporary writ of injunction becomes effective immediately. Duncan v. Boyd (Tex. Civ. App.) 288 S. W. 281; Alpha Pet. Co. v. Terrell, 122 Tex. 257, 59 S.W.(2d) 364, 372. While the judgment of the Court of Civil Appeals in the instant case did not expressly dissolve any temporary injunction, for none had been issued, yet it did, in effect, terminate the temporary restraining order theretofore granted, and no reason is perceived why the holding in the cases above cited should not be controlling in the instant case.

■■■ Further, the trustee's sale was made after an agreed judgment had been entered in the trial court that the plaintiffs, appellants here, take nothing. · That was the case in which the temporary restraining order had theretofore been issued. The South-land Royalty Company was not a party to that suit, but its vendors, the Rhotons, were parties thereto. If, while an appeal is pending from an order granting a temporary injunction, the case is tried upon its merits and a permanent injunction denied, such denial terminates the temporary injunction and renders that issue in the appellate court moot. The trial court has jurisdiction to enter final judgment upon the merits while an appeal from a temporary injunction is pending. Magnolia Pet. Co. v. Blankenship (Tex. Civ. App.) 70 S.W.(2d) 258; Staples v. State (Tex. Civ. App.) 244 S. W. 1064; Hill v. Pure Oil Co. (Tex. Civ. App.) 38 S.W.(2d) 855.

The judgment of the trial court will be affirmed.

### On Rehearing.

In our original opinion we stated: "Mr. Rhoton did not testify, but Mrs. Rhoton, in her testimony, acknowledged the validity of the debt, and of the lien securing same, and stated that the purpose of employing an attorney was to stay the foreclosure until they could refinance the debt."

This statement was based upon the following testimony given by Mrs. Rhoton:

"Q. Tell what your agreement was with Lockhart. A. There was talk of a moratorium and we couldn't at that time, owing to the scarcity of money, refinance our place, so I said if we could get an injunction to keep our property from being sold at a sacrifice and hold it until this moratorium came in that in all probability we could soon refinance our property. Mr. Lockhart said, 'I can get the injunction for you, but you will have to give me a half interest in the property, and you will have to deed it to me now', and we did and he got the injunction as we understood.

"Q. You did execute and deliver to Lockhart a deed at that time? A. A deed for half interest in the property, but he wasn't to come into that property until it was paid.

"Q. You mean by that he was merely to get half interest— A. After all was over, after we paid off that, whatever interest we repaid—refinance it, he was to have half interest."

This testimony probably does not support the statement that Mrs. Rhoton acknowledged the validity of the lien, and the sentence above quoted from our opinion is so corrected as to omit therefrom "and the lien securing same." This inaccuracy of expression did not affect in any degree the conclusions announced in our opinion, but we are glad to make the correction in fairness to the appellants, and in the interest of accuracy.